**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | **BODY TRANSIT, INC.** | : | **Chapter 11** |
| | **d/b/a RASCALS FITNESS,** | : | |
| | | : | |
| | **Debtor** | : | **Bky. No.  20-10014 ELF** |

# A M E N D E D   O P I N I O N

## I.  INTRODUCTION

On January 2, 2020, Body Transit, Inc. ("the Debtor") filed a voluntary petition under chapter 11 of the Bankruptcy Code.  In the petition, the Debtor designated itself as a "small business debtor" as defined in 11 U.S.C. §101(51D).

On March 2, 2020, the Debtor filed a motion requesting authority to proceed under the Small Business Reorganization Act of 2019 ("the SBRA"), codified as subchapter V of chapter 11 of the Bankruptcy Code, 11 U.S.C. §§1181-1195.  The motion was contested by the Debtor's secured creditor, First Bank.

By Memorandum and Order dated March 24, 2020, I granted the Debtor's Motion, see In re Body Transit, Inc., 613 B.R. 400 (Bankr. E.D. Pa. 2020), and the case has proceeded since then under subchapter V.

Presently before the court are two (2) interrelated contested matters:

(1) the Debtor's objection to First Bank's Election Pursuant to §1111(b) of the Bankruptcy Code ("the §1111(b) Election Objection") (Doc. #'s 142, 166); and

(2) the Debtor's Motion to Value and Determine Secured Status of First Bank's Lien on the Debtor's Tangible and Intangible Property, based on 11 U.S.C. §506(a) and Fed. R. Bankr. P. 3012 ("the Valuation Motion") (Doc. # 149).

At the risk of oversimplification, §1111(b) permits an undersecured creditor to elect to have its claim treated as fully secured for certain purposes in a chapter 11 reorganization.  In this case, the Debtor filed an objection, asserting that First Bank is not entitled to make that election. Instead, the Debtor argues that it should be permitted to bifurcate First Bank's claim into secured and unsecured components pursuant to 11 U.S.C. §506(a), so that the two (2) components can be treated differently in a plan of reorganization.

For the reasons stated below:

    (1) the Debtor's §1111(b) Election Objection will be sustained;

    (2) the Debtor's Valuation Motion will be granted; and

    (3) an order will be entered determining that First Bank holds an allowed secured claim of $80,000.00 and a general unsecured claim of $890,233.13.[1]

## II.  PROCEDURAL HISTORY AND BACKGROUND

I described the procedural history and background of this bankruptcy case in some detail in my prior Memorandum.  To put the current disputes in context, it is helpful to review briefly certain aspects of that background, as well as subsequent developments in the case.

As stated earlier, the Debtor commenced this case on January 2, 2020.  At that time, the Debtor operated three (3) fitness clubs in Montgomery County, Pennsylvania.  On January 31,

---

[1]    First Bank filed a series of proofs of claim as a secured creditor totaling approximately $1.1 million.  The Debtor has not objected to these claims.  Therefore, the claims are allowed.  11 U.S.C. §502(a).  However, there is no dispute that the prepetition claim has been reduced by certain payments First Bank received during the pendency of this case.  In its submissions in the present contested matters, First Bank acknowledges that the unpaid balance of its claim is $970,233.13.  Based on my rulings, as explained in this Opinion, $80,000.00 of that claim is an allowed secured claim and the balance of the claim is an allowed unsecured claim.

2020, First Bank filed four (4) claims totaling approximately $1.1 million, asserting a secured

position in all of the Debtor's assets.[2]

Since commencement of the case, the Debtor closed and sold the assets in its location in

Pottstown, PA, referred to by the parties as "North Coventry location" (for the township in

which it is located).  (See Doc. # 55).  The Debtor also closed its second location in Limerick,

PA and the lessor at that site has been granted relief from the automatic stay to retake possession

of the premises.  (See Doc. # 95).

The Debtor seeks to reorganize through the operations of its one (1) remaining location,

in Collegeville, PA.

On February 21, 2020, Collegeville Plaza Associates, L.P. ("CPA"), the Debtor's lessor

of the premises at the Collegeville location filed a motion for relief from the automatic stay,

seeking authority to pursue the entry of a money judgment and a judgment for possession of the

premises.  (Doc. # 72).  After a number of consensual continuances, probably driven by the

COVID-19 shutdown that began in Pennsylvania on March 16, 2020, a hearing on CPA's

Motion was held on May 13, 2020.  The day following the hearing, I entered an order granting

CPA relief to proceed with its state court litigation, but solely for the purpose of obtaining a

money judgment and a judgment for possession; i.e., the stay remaining in place to preclude any

enforcement of the judgment.  The May 13, 2020 order also required the Debtor to make an

adequate protection payment and scheduled a further hearing on June 24, 2020  to consider

whether CPA should be granted additional relief.  (See Doc. # 153).  The June 24th hearing was

---

[2]        Each proof of claim is supported by, inter alia, an attached note and security agreement.

       For ease of reference, I will follow the parties' convention and refer to First Bank's
multiple claims in the aggregate as a single claim.

continued by agreement to July 15, 2020, when it was continued again by agreement to August

19, 2020.

On April 11, 2020, the Debtor filed a proposed chapter 11 plan of reorganization, (Doc. #

125), and an amended plan on April 22, 2020, (Doc. # 146).[3]

On April 19, 2020, First Bank filed an "Election Pursuant to 11 U.S.C. §1111(b)(2) to

Have its Claim Treated as Fully Secured" ("the §1111(b) Election").  (Doc. # 142).  The

§1111(b) Election states: "First Bank hereby elects that its claim, notwithstanding 11 U.S.C.

§506(a), be treated as a secured claim to the extent that such claim is allowed  . . . ."  Id.

The Debtor responded by filing the Valuation Motion on April 29, 2020.  (Doc. # 149).

At a status conference held on May 20, 2020, the Debtor stated its intent to object to the

§1111(b) Election.  After a colloquy with counsel, I scheduled a hearing on June 18, 2020 to

consider the Valuation Motion and the Debtor's as-of-then unfiled §1111(b) Election Objection.

The Debtor filed the §1111(b) Election Objection on June 4, 2020.  (Doc. # 165).

A consolidated hearing on the two (2) contested matters was held and concluded on June

18, 2020, after which I took the matters under advisement.


### III.  THE PARTIES' RESPECTIVE POSITIONS

#### A.  The Debtor

The Debtor's position in these contested matters is grounded in the reorganization

strategy that is set forth in the proposed amended plan of reorganization ("the Plan"), filed on

---

[3]      At a status hearing held on May 20, 2020, the parties and the court agreed that the
hearing on confirmation of the Plan should await the resolution of the §1111(b) Election Objection and
the Valuation Motion.

April 22, 2020.

## 1. the Plan

The Plan is straightforward: it provides for payment of administrative expenses

(estimated at $60,000.00) and for no distribution on account of allowed unsecured claims.

As for First Bank, the Plan posits that First Bank's claim will be reduced to $944,364.00

after credit is given for payments made from the sale of the Debtor's assets during the course of

the bankruptcy case.  The Plan also proposes to treat and pay First Bank as a secured creditor,

but only to the extent of $317,578.82.

The Debtor proposes to pay First Bank's allowed secured claim (described in the plan as

being $317,578.82) over 60 months, at an interest rate of 3.5%.  The payments are graduated,

starting with monthly payments of $1,153.12, increasing at several junctures during the

repayment term, and culminating with 24 payments of $7,392.60 per month.  The Debtor

calculates that First Bank will receive $29,059.51 in interest, in addition to full payment of its

(proposed) allowed secured claim.[4]

The Debtor's reorganization strategy may be summarized as follows.  The Debtor seeks

---

[4]        The Plan also references a second secured creditor – "Univest Bank."  After the Plan was filed, two (2) entities with the name "Univest" filed proofs of claim.  Univest Capital, Inc. filed a proof of claim in the amount of $39,534.99, secured by "gym equipment."  Univest Bank and Trust Co. filed an unsecured proof of claim in the amount of $11,893.07.

The Plan's proposed treatment of the secured "Univest" claim is difficult to understand. Univest is not mentioned in Article 2 of the Plan, titled "Classification of Claims and Interests."  In Article 4 (titled "Treatment of Claims and Interests Under the Plan"), "Univest Bank" is (surprisingly and improperly) lumped together with First Bank as a class 2 creditor, with the notation: "Pre-Postpetition Financing . . .  XX Impaired . . . Equipment Value Diminished."

There are some obvious problems with the Plan, but it is premature to discuss them as we have not yet reached the confirmation hearing.

to:

- bifurcate First Bank's allowed claim into secured and unsecured components through 11 U.S.C. §506(a)(1);[5]

- provide in the Plan for payment of First Bank's allowed secured claim pursuant to 11 U.S.C. §1191(b), (c)(1) (incorporating 11 U.S.C. §1129(b)(2)(A));[6] and

- pay nothing on account of First Bank's substantial allowed unsecured claim or to the holders of all other allowed unsecured claims, see 11 U.S.C. §1191(b), (c)(2).[7]

---

[5]     11 U.S.C. §506(a)(1) provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

[6]     Without going into all of the confirmation requirement details, for present purposes it is sufficient to say that under §1191(b), a plan in a subchapter V case can be confirmed without the consent of a class of creditors if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1191(c) then provides that the "fair and equitable requirement" for a class of secured claims includes the requirements stated in §1129(b)(2)(A). Section 1129(b)(2)(A) provides that the "fair and equitable" requirement includes the requirement that the holders of secured claims retain their liens and that they receive deferred cash payments of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

[7]     11 U.S.C. §1191(b), (c)(2) provides that the "fair and equitable" confirmation requirement, with respect to a non-consenting class of unsecured creditors, includes the requirement that the Debtor apply all of its disposable income for at least a three (3) year period for making payments under the plan and that the value of the plan distributions is not less than the debtor's disposable income. For a business entity subchapter V debtor, 11 U.S.C. §1191(d) defines "disposable income" as the debtor's income that is not reasonably necessary "for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor."

## 2. the Valuation Motion

The Debtor filed the Valuation Motion as the mechanism for implementing the bifurcation of First Bank's claim into secured and unsecured components, as contemplated by the Plan.

In the Valuation Motion, the Debtor asserts, pursuant to §506(a), that First Bank's allowed secured claim should be determined to be $267,573.82. The Debtor calculates the $267,573.82 by adding the amount it contends is the value of the tangible bankruptcy estate assets subject to First Bank's lien ($29,750.00) to the equity available to First Bank in the Debtor's principal's residence ($237,823.82), First Bank holding a mortgage on the residence in conjunction with a personal guaranty given by the principal.[8]

## 3. the §1111(b) Election and the §1111(b) Election Objection

Section 1111(b) of the Bankruptcy Code provides:

(1)

    (A)   **A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502** of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, **unless**—

---

[8]    The Valuation Motion is not consistent with the Plan, which contemplates a First Bank allowed secured claim of $317,578.82.

Nor is the Valuation Motion consistent with the Debtor's §1111(b) Election Objection. In the §1111(b) Election Objection, unlike the Valuation Motion, the Debtor excludes from its calculation of First Bank's property interest the equity the residential real estate of the Debtor's principal that is subject to First Bank's mortgage lien, leaving only the $29,750.00 of value attributable to the Debtor's tangible assets.

(i)    **the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection**; or

(ii)   such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B)    **A class of claims may not elect application of paragraph (2) of this subsection if—**

(i)    **the interest on account of such claims of the holders of such claims in such property is of inconsequential value**; or

(ii)   the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2)    **If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed**.

(emphasis added).

By making the §1111(b) Election, First Bank seeks to override the operation of §506(a).

In its §1111(b) Election Objection, the Debtor seeks to prevent First Bank from invoking §1111(b)(2) and to preserve its ability to bifurcate First Bank's claim under §506(a) through the Valuation Motion.  The Debtor relies on §1111(b)(1)(B)(I) in support of the §1111(b) Election Objection, contending that First Bank's interest in property of the bankruptcy estate is of "inconsequential value."

The term "inconsequential value" is not defined in the Bankruptcy Code.  The Debtor proffers that First Bank's interest is "inconsequential," nonetheless, because First Bank's

collateral supports only approximately 3.5% of its claim.[9]  The Debtor references only its

tangible equipment (which it values as less than $30,000.00) and compares that value to First

Bank's claim (which the Debtor believes is just under $1 million after proper credits are

applied).[10]

## B.  First Bank

First Bank disputes the Debtor's position at every turn.

First Bank offers two (2) threshold arguments why, as a matter of law, the §1111(b)

Election Objection should be overruled.

Initially, First Bank asks the court to follow In re Baxley, 72 B.R. 195, 198 (Bankr.

D.S.C. 1986), which held that the creditor's property interest securing the claim must have no

value whatsoever – i.e., the creditor's position must be entirely undersecured  – for such interest

to be of "inconsequential value" under §1111(b)(2).[11]  Since the Debtor acknowledges that First

---

[9]      The Debtor asks this court to follow the bankruptcy court's decision in In re Wandler, 77
B.R. 728 (Bankr. D.N.D. 1987).  In Wandler, the court held that collateral with a value of approximately
4% of the creditor's $390,000.00 claim was of inconsequential value, thereby eliminating the creditor's
ability to elect to have its claim treated as fully secured under §1111(b).  See id. at 733.

[10]      In the §1111(b) Election Objection, unlike in the Valuation Motion, the Debtor did not
include in its calculation First Bank's property interest in the equity of the residential real estate of the
Debtor's principal that is subject to First Bank's mortgage lien.  See note 8, supra.

[11]      As additional support for the holding in Baxley, First Bank cites several cases in which
the  court disallowed the §1111(b) election to creditors whose positions was entirely undersecured.  See
In re Mountain Side Holdings, Inc., 142 B.R. 421 (D. Col. 1992); In re 500 Fifth Ave. Assocs.,148 B.R.
1010 (Bankr. S.D.N.Y. 1993); In re Cook, 126 B.R. 575, 581 (Bankr. D.S.D. 1991), aff'd in part, rev'd in
part sub nom. U.S. ex. rel. Farmers Home Admin. v. Cook, 147 B.R. 513 (D.S.D. 1992).

First Bank's argument in this regard is logically fallacious.  The fact that courts have held
(continued...)

Bank's security interest in the Debtor's property has some value, it follows, according to First

Bank, that it may make the §1111(b) election.

Second, First Bank argues that the undefined term, "inconsequential value," should be

determined by comparing the value of the creditor's lien to the value of the creditor's collateral,

not (as the Debtor posits) by comparing the value of its lien to the total amount of its claim.  See

In re McGarey, 529 B.R. 277, 284 (D. Ariz. 2015).  Under this approach, a creditor holding a

first position lien on the debtor's property would always have an interest that is consequential

and be entitled to make the §1111(b) election, while only severely undersecured creditors would

be precluded from making the election.  See In re At-Net Servs.-Charlotte, Inc., 2015 WL

4915716, at *5 (Bankr. W.D.N.C. Aug. 17, 2015); In re Rosage, 82 B.R. 389, 390 (Bankr. W.D.

Pa.1987).

Since it is undisputed that First Bank holds a first position lien on all (or at least virtually

all) of the Debtor's property, it follows, according to First Bank, that it may make the §1111(b)

Election.

Finally, First Bank contends that even if the Debtor's methodology for determining

inconsequential value is employed, the value of its lien interest is not inconsequential and

therefore, the §1111(b) Election Objection still should be overruled.  This argument blends into

its opposition to the Valuation Motion.

First Bank claims that the value of its interest in the Debtor's property is almost

$170,000.00, consisting of tangible assets worth $129,725.00 and good will with a value of

_____

[11](...continued)
that liens with no value are of inconsequential value does not mean that liens **must** have no value to be of
inconsequential value.

$40,000.  It acknowledges that, after crediting payments received during the pendency of this

bankruptcy case, the unpaid balance of its claim is $970,233.13.  If First Bank's valuations

prevail, the value of its lien in the Debtor's property is approximately 17.5% of its claim, far in

excess of the 4% held to be inconsequential in <u>Wandler</u> and an amount that the court should find

to be consequential.


## IV.  FACTS

At the beginning of the evidentiary hearing held on June 18, 2020, I considered First

Bank's initial argument summarized above that, as a matter of law, the §1111(b) Election

Objection should be overruled (and therefore, the Valuation Motion denied) because there is at

least some value to its lien on the Debtor's property.  At that time, I rejected the argument.  First

Bank did not then press its second legal argument (<u>i.e.</u>, that "inconsequential value" should be

determined by comparing the value of the creditor's lien to the value of the creditor's collateral)

and we moved on to the submission of evidence.[12]

I will return to both of these legal issues in Part V.C. below and explain why First Bank

was not entitled to prevail as a matter of law.  But first, I will set out my factual findings.  Doing

so will place the legal issues presented by the parties in this case in their proper factual context.


---

[12]     In pointing this out, I am not suggesting that the second argument was waived.  I will
address the argument in Part V.C., <u>infra</u>.

### A.  The Evidence

### 1. the Debtor's Witnesses

The Debtor presented two (2) witnesses in support of the §1111(b) Election Objection and the Valuation Motion.

The Debtor's first witness was Richard A. Jackim.

Jackim is the managing partner of Sports Club Advisers, Inc. ("SCA"), a company he founded in 2016.  SCA is in the business of advising companies in the fitness industry with respect to the sale or acquisition of sports & fitness related businesses and equipment.  Prior to starting SCA, Jackim worked in a number of businesses that were involved in valuing, selling or acquiring private businesses.  He has testified as an expert in numerous matters going back to the mid 1990's.  Although he was not formally qualified as an expert during the hearing, he offered an opinion, without objection, regarding the value of the Debtor entity.

Essentially, as stated in his report, (Ex. D-2), Jackim testified that the present market in the fitness industry is so illiquid – due to conditions caused by the COVID-19 pandemic – that the Debtor's business "could not be sold as a going concern."  Jackim opined that if the Debtor can survive the current restrictions on operations caused by the pandemic, it could have value in the future.  But presently, its only value is its liquidation value.

Jackim acknowledged that he had not inspected the Debtor's facility or reviewed its financials.  He further acknowledged that he had not prepared a valuation in accordance with the standards of the American Society of Appraisers ("the ASA").  Rather, he stated he was presenting an opinion based on his overview of the present state of the fitness industry.  In light of the industry's current condition, he opined that a traditional business valuation (employing a discounted cash flow analysis) would not present an accurate picture of a fitness business' value.

In his view, this was because historical data regarding fitness business valuation has lost its

predictive power due to the dramatic changes to the industry caused by the pandemic.[13]

More specifically, Jackim stated in his report:

> Given that most fitness clubs will be re-opening with less than 50% of their 2019 members, clubs will need to have sufficient capital reserves to fund significant operating losses for the first 6-9 months following re-opening.  Based on the average operating costs for a typical 3,500 SF fitness studio, owners that plan to re-open will need at least $150,000 in capital per location to fund these operating losses.

> . . . [I]n addition to funding operating losses, clubs that plan to re-open will need capital to pay for increased marketing and membership acquisition programs.

(Ex. D-2).

Jackim opined that it may well take two (2) years before fitness businesses settle on a

"new normal."

The Debtor's second witness was Michael Caruso.

Caruso is a fitness equipment broker operating through the entity

---

[13]    In his report, Jackim stated:

> [N]o credible valuation firm could prepare a defensible valuation of a fitness center right now. Any valuation would be based on assumptions that are pure speculation given the unprecedented impact that COVID-19 has had on the fitness industry.

(Ex. D-2).  He further explained the basis for this opinion as follows:

> [The] cost structure of most clubs will need to change dramatically in a post-COVID-19 world.  Industry experts expect that clubs will face limits on the number of people who can be in a club at any given time, that class sizes will need to be smaller, that operating costs will increase due to the need to sanitize equipment between uses, etc. As a result, using historical revenue and historical margins to estimate future profitability would be fundamentally flawed.

(Id.)

-13-

WeBuyGymEquipment.com. Caruso operates in the wholesale market, assisting fitness centers that are looking to sell their equipment to other fitness centers.

Caruso inspected the Debtor's equipment at the Limerick location and prepared a report in April 2020 in which he valued the equipment between $28,000.00 to $30,000.00. (Ex. D-4). At the hearing, he testified that due to a glut in the market caused by the COVID-19 shutdown, the equipment value is probably about 10% less than his prior valuation.

Caruso, like Jackim, acknowledged that his opinion was not based on the employment of the valuation standards of the ASA.[14]

### 2. First Bank's Witnesses

First Bank presented two (2) witnesses on valuation.

First Bank's first witness was James W. Comley, Vice President of Wm. F. Comley & Son, Inc., a well-known and respected auctioneer and appraisal company located in Philadelphia, PA.[15] Comley is a licensed auctioneer and a member of the ASA. Comley was qualified as an expert in the valuation of equipment when liquidated in place and two (2) written valuation reports that he authored were admitted into evidence. (See Ex's. FB-6 and FB-7).

Comley's testimony during the hearing was relatively brief and conclusory. Therefore, to evaluate the strength of his opinion, it is helpful to consider the content of his report (which, like all of the exhibits referenced herein, was admitted into evidence).

Comley's report is a "Desktop Appraisal," which is defined in the report as "an expert's

---

[14]    Caruso also was not formally qualified as an expert, but testified without objection.

[15]    The company has been operating since 1834.

opinion of value based on limited information and assumptions . . . and a limited appraisal of market conditions.[16]  Comley did not inspect the equipment, but relied entirely on information provided to him by First Bank.

The report references the potential use of the three (3) traditional valuation methods: Cost Approach, Market Data Approach and Income Approach.  The report states that Comley found the Market Data Approach the most useful in the context of valuing used fitness equipment.  Without any further explanation, the report states: "After compiling all research data a valuation is determined and provided in . . . the Addenda section . . . ."  (Ex. FB-7, at 6).  Nowhere in the report is there any discussion or analysis of the research data that was considered.  In the addenda, the report provides a list and value for each piece of equipment at the Collegeville location, with the values totaling $129,725.00.

The last witness to testify was Edward Wilusz, President of the entity Value Management, Inc.  Wilusz, a member of the ASA, has conducted business valuations for almost forty (40) years.  He was qualified as an expert in the field of business valuation.

Wilusz was retained by First Bank to prepare a valuation of the intangible assets of the Debtor.  He prepared a report that was admitted into evidence.  (Ex. FB-8).[17]  To prepare the report, he reviewed a number of documents including the Debtor's 2018 tax return, the Debtor's amended plan of reorganization, the report prepared by Comley and the Debtor's disposable income projections filed with the court on April 22, 2020.

---

[16]    Comley's Desktop Appraisal covered the equipment located in both the Limerick and North Coventry locations, as well as Collegeville.  I will reference only those parts that relate to the Collegeville location.

[17]    The report is dated June 5, 2019; obviously, a typographical error.

Wilusz opined that the value of the Debtor entity is $170,000.00, employing a "Market Approach," summarized in more detail below.  He did not rely on the $129,725.00 value of the tangible assets determined by Comley in his analysis, but after reaching his conclusion, he accepted that value.  Consequently, he stated that the $170,000.00 value consisted of $129,725.00 in value attributable to the tangible assets, plus $40,025.00 of value in the Debtors intangible assets.

In forming his opinion, Wilusz relied exclusively on the Market Approach, which he described in his report as requiring an examination of "the relationship between prices that buyers have been willing to pay for stock in companies that provide a reasonable basis for comparison to the relevant characteristics of the company being valued and various quantifiable facts," after which "derived ratios are applied to the subject company in order to establish value."  (Ex. FB-8, at 5).

Wilusz began his analysis of the Debtor by considering two "rules of thumb" for fitness centers derived from an accepted commercial guide: (1) value equals 70-100% of annual revenue, plus inventory; and (2) value is 2-3.5% times seller's discretionary earnings ("SDE") plus inventory.  (Id. at 6).  He then examined the sales of approximately 30 fitness and yoga businesses that occurred between January 2019 and March 2020, concluding that the median value was 60% of  net sales and that the value was approximately double the SDE.  (Id. at 7).

Wilusz then applied these benchmarks  to the Debtor's projected revenue in the first year, post-confirmation and then to the projected revenue in the third year post-confirmation.  In both analyses, Wilusz gave great weight to the SDE benchmark derived from the historical financial data.  Apparently in support of the use of this historical data based on transactions that preceded

the COVID-19 economic contraction, Wilusz reasoned:

> COVID-19 does impact value. Subsequent to the quarantine, the stock markets did fall significantly and transaction activity dropped. However, **the stock markets have recovered much of their losses. While uncertainty exists, there is optimism on the recovery**.

(Id. at 7) (emphasis added).[18]

From his analysis of the first-year projections, Wilusz calculated a value of $165,000.00, He reduced his multipliers (Estimated Value/Sales and Estimated Value/SDE) to capture the COVID-19 impact.

His analysis of the third year post-confirmation was somewhat more complicated. He did not use the reduced multipliers but rather applied the pre-COVID-19 multipliers, although again he gave more weight to the SDE benchmark, and arrived at a fair market value of $395,000.00 based on year-three revenues. He then discounted that value given the uncertainty of the company's ability to achieve that level of performance (presumably due to COVID-19). He determined that for an investor to buy a company today that would be worth $395,000.00 in three (3) years, the investor would expect a 30% return. Employing that discount rate, Wilusz found the present value to be $179,791.00. (Id. at 8).[19]

Given the modest range of values derived from the two (2) calculations, Wilusz settled on a present day valuation of $170,000.00, allocating $129,725.00 to the value of the tangible assets (i.e., the Comley valuation) and $40,025.00 in intangible asset value. (Id.).

---

[18]     Wilusz's sunny optimism stands in stark contrast to Jackim's testimony regarding the state of the fitness industry.

[19]     In his testimony, Jackim opined that the 30% discount rate was far too low given the risks accompanying current market conditions. Of course, employing a substantially higher discount rate would also substantially lower the present value.

## B.  Factfinding

The object of this entire inquiry is to determine the value of First Bank's secured position

on the Debtor's assets.  As in many valuation hearings, the parties have presented knowledgeable

witnesses, with solid credentials, each of whom has offered an opinion supported by a considered

rationale, yet reaching dramatically different conclusions.  And, as also is often true in these

matters, no single opinion offered at the hearing was fully convincing.

After weighing and evaluating the evidence, I find that the value of First Bank's interest in

the Debtor's assets (tangible and intangible) is $80,000.00

My starting point is 11 U.S.C. §506(a):

> . . . value shall be determined in light of the purpose of the valuation and of the
> proposed disposition or use of such property, and in conjunction with any hearing
> on such disposition or use or on a plan affecting such creditor's interest.

In light of this statutory instruction, it is difficult to fully accept the Debtor's premise that

the proper valuation methodology is the liquidation value of its tangible assets.  The Debtor

intends to use its assets in order to reorganize as a going concern.

The House Report in the legislative history of 11 U.S.C. §506(a) offers the following

guidance on the issue:

> "Value" does not necessarily contemplate forced sale or liquidation value of the
> collateral; nor does it always imply a full going concern value. Courts will have to
> determine value on a case-by-case basis, taking into account the facts of each case
> and the competing interests in the case.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977).

The Senate Report is somewhat more concrete on the issue:

> In any particular case, especially a reorganization case, the determination of which
> entity should be entitled to the difference between the going concern value and the
> liquidation value must be based on equitable considerations arising from the facts

-18-

of the case.

S. Rep. No. 989, 95th Cong., 2d Sess. 54 (1978) ("Senate Report").

Case law on the subject emphasizes the discretion granted the bankruptcy court to choose an appropriate valuation methodology as contested matters arise during the course of a bankruptcy case.  See, e.g., In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 74–76 (1st Cir. 1995); In re Vacuum Cleaner Corp. of Am., 33 B.R. 701, 703 (Bankr. E.D. Pa. 1983).

As will be discussed more fully in Part V.D. below, since the underlying object of the valuation inquiry in this case is to determine whether First Bank may make the §1111(b) Election, the future revenue stream of the Debtor and the potential increase in the value of First Bank's collateral based on an anticipated increase in the Debtor's revenue stream is a relevant consideration.  Thus, I consider it appropriate to approach the valuation issue from the starting point of determining the Debtor's enterprise value, rather than through a liquidation analysis of its tangible assets with the potential of then making an adjustments based on equitable considerations.

This starting point lends support to Wilusz's valuation approach.  However, I find that Wilusz has not fully taken into account the present economic conditions in the fitness industry arising from the COVID-19 economic shutdown and therefore, his degree of optimism unwarranted.  In particular, I perceive no valid nexus between the state of the stock market over the past few months and the state of the fitness industry or the Debtor's potential reorganization prospects.

Overall, I found Jackim's testimony was more credible and persuasive.  I also tend to agree with Jackim's assessment that the Debtor's projections may be over optimistic.  At a

-19-

minimum, it is not presently possible to project when public health and market conditions will

support the growth of business revenues the Debtor posits as the foundation of its reorganization.

See generally In re Tuma, 916 F.2d 488, 491 (9th Cir. 1990) (affirming bankruptcy court

valuation  methodology, finding appropriate the court's methodology of looking toward the future

functioning of the debtor entity).  The Debtor appears to acknowledge this uncertainty.[20]

Based on this assessment of the evidence presented, I consider it extremely unlikely that

an investor would purchase the Debtor's business as an ongoing entity, except perhaps, at a

substantial discount compared to what the Debtor's projections show.  But, that does not mean the

Debtor's business has no value.

I draw a distinction between what I might describe as a "pure" investor and an

"entrepreneur-purchaser."  The "pure" investor makes a critical assessment of the return expected

on the amount of money invested and thereby calculates the price he or she is willing to pay to

buy a business as a going concern (in the manner described by Wilusz).  In that model, the

business is simply a commodity that will provide a return on an investment of money.  Jackim

testified, credibly in my view, that currently (and I infer, for the future, at least in the short run),

that no such investor would purchase the Debtor's business or any other fitness club.

What I have termed the "entrepreneur-purchaser" differs in that he or she intends to labor

in the business with the intention of growing it, meanwhile drawing out compensation in some

form (be it salary or dividends).  This type of purchaser is willing to pay for the business and

employment opportunity in an amount commensurate with likely return, taking into account the

---

[20]    The Debtor's Amended Plan does not attempt to predict when its revenues will be
sufficient to permit it to perform its plan obligations.  The supporting projections to the Plan, (see Plan
Ex. A, Doc. # 146), do not commence on a specific date in the future.  They are made generically (i.e.,
running from month 1 to month 60).

risks of failure.  For the entrepreneur-purchaser, the purchase of the business represents both an investment and a "job."

Here, as First Bank suggests, the fact that the Debtor's principal wishes to retain the business based on its potential future growth means that there is some value to the business, independent of the liquidation value of its assets  –  at least where the principal's desire has some rational basis.

Taking into account the Debtor's financial obligations under the currently proposed Plan (which include payment of the estimated $60,000.00 in administrative expenses and payments totaling approximately $185,000.00 to First Bank over the first thirty-six (36) months of the Plan), the Debtor still projects the ability to pay its principal an amount that increases from $48,000.00 per year to $108,000.00 per year.  There necessarily is some value in this business opportunity – even after considering that: (a) the revenue projections and the level of compensation the Debtor's principal projects to obtain from the entity seem to be over optimistic, (b) there is substantial risk involved, and (c) the compensation generated is dependent to some extent on the time and labor the principal must expend to create the value, not just from the investment of money.

This discussion is designed to illustrate why I found neither side's valuation approach fully satisfactory.

Given the need to make a determination of value before turning to the issue of "inconsequential value," my solution is to follow Wilusz's general approach to valuation but to increase the risk factor that he employed by doubling it, which would result in a valuation of

$96,435.55.[21]  After making a slight additional adjustment, see Senate Report at 54, I find that the

value of First Bank's interest in the Debtor's assets is $80,000.00.[22]

Analyzing the valuation issue from a slightly different perspective, my finding suggests

that an interested "entrepreneur-purchaser" with adequate resources would be willing to pay a

premium of $50,000.00 over the $30,000.00 value of the tangible assets in order to buy the

Debtor entity as a going concern.  Such a low premium accounts for the high degree of financial

risk in the purchase of a fitness club in the present environment.  While possible, there is no

guarantee that the Debtor will survive the present, brutal economic climate in the fitness industry

and subsequently generate sufficient revenue to pay an entrepreneur-purchaser any salary at all,

much less the compensation stated in the Debtor's optimistic projections.

---

[21]     The $96,435.55 figure is derived from use of a  discount rate calculator and employing a
60% risk factor.  See http://www.moneychimp.com/calculator/present_value_calculator.htm.

[22]     In reaching this conclusion, I have necessarily resolved the conflict in the testimony
regarding the value of the tangible assets in favor of Caruso, the Debtor's witness, over First Bank's
witness, Comley, who assigned a value of almost $130,000.00 to the tangible assets alone.

Although I respect Comly's qualifications and expertise and acknowledge that he and his
company have been employed successfully as an allied professional in an innumerable number of
bankruptcy cases in this district over the years, I was unpersuaded by his testimony and report in this
particular case.  Interestingly, in his written valuation report regarding the Debtor's assets provided to
First Bank in December 2019 (FB-6), just prior to the commencement of the bankruptcy case, Comly
employed a liquidation analysis of the Limerick assets and arrived at value of $43,000.00, much closer to
the approximate $30,000.00 value reached by Caruso approximately four (4) months later (and after the
commencement of the COVID-19 economic shutdown).

In the end, I found Comly's testimony and second valuation report (FB-7) unpersuasive.
It was far too conclusory and lacking in any explanation of the methodology used in adjusting his
valuation from liquidation to liquidation "in place."  Nor did Comly attempt to update his February 2020
opinion or account for the impact of the unprecedented public health emergency that our society
experienced beginning in March 2020.  By comparison, I found Caruso's opinion based more on market
experience generally and present market conditions, in particular, more persuasive.

For these reasons, my finding is that the value of First Bank's interest in the Debtor's

assets is $80,000.00.


## V. DISCUSSION

### A. Introduction

Having made my finding on valuation, I now turn to the critical mixed fact-law issue

presented in these contested matters: is First Bank's interest in the Debtor's property

"inconsequential" within the meaning of 11 U.S.C. §1111(b)(1)(B)(i)?

Section 1111(b)(1)(B)(i)  creates an exception to the exercise of a secured creditor's right

to make the election permitted by §1111(b)(2).  In order to understand the proper scope of the

exception, it is first necessary to understand the operation and purpose of the right to make the

§1111(b) election.  Only then is it possible to understand the function of the restriction on the

election right of a creditor holding an "inconsequential" interest in the Debtor's assets.

To work through these issues, I will begin by discussing the §1111(b) election generally.

Then, I will turn to the exception and state the rationale for my conclusion that the legal standard

for determining "inconsequential value" requires a comparison of the value of the secured

creditor's interest in its bankruptcy estate collateral and the creditor's total claim.  Finally, I will

make (and explain the basis for) my mixed fact-law determination that the value of First Bank's

lien position is inconsequential within the meaning of §1111(b)(1)(B)(i).[23]

---

[23]    I characterize the determination of "inconsequential value" as a mixed fact-law question
because it does not involve a determination of "historical facts," i.e., findings regarding "a thing done, an
action performed, or an event or occurrence."  William W. Schwarzer, Alan Hirsch & David J. Barrans,
The Analysis and Decision of Summary Judgment Motions 14 (Federal Judicial Center 1991).  Rather,
the finding is "derived by reasoning or inference from evidence . . . incorporat[ing] legal principles or
(continued...)

### B.  §1111(b) Election

### 1.  the effect of §1111(b) election

Section 1111(b) of the Bankruptcy Code is a complex statutory provision, with a number

of moving parts that interact with other Code provisions, such as 11 U.S.C. §363 and §1129(b).

See Cook, 126 B.R. at 580 (describing §1111(b) as a "tortuous journey through a statute and its

legislative history that is fraught with complex concepts, terms of art, and innuendo").

That said, the leading treatise on bankruptcy law concisely describes its operation as

effecting two modifications in the ordinary process of allowing claims in bankruptcy cases:

> Initially, section 1111(b)(1) converts, with some exceptions, nonrecourse
> deficiency claims into unsecured claims. Next, section 1111(b)(2) allows holders
> of certain partially secured claims to waive their unsecured deficiency claims and,
> contrary to section 506(a), have their entire debt treated as a secured claim.

7 Collier on Bankruptcy ¶1111.03 (Richard Levin, Henry J. Sommer eds., 16th ed. 2020)

("Collier").

The case at bar does not involve a non-recourse creditor. Therefore, I will limit my

discussion to the election that an undersecured creditor is permitted to make under §1111(b)(2)

and the circumstances in which the creditor is ineligible to make that election.  Compare 11

U.S.C. §1111(b)(2), with 11 U.S.C. §1111(b)(1)(B)(i).

The best place to start a discussion of the §1111(b) election is with a description of its

effect.  One commentator explained it concisely as follows:

---

[23](...continued)
policies that give them independent legal significance."  Id. at 16; see also 15375 Memorial Corp. v.
Bepco, L.P., 589 F.3d 605, 616 (3d Cir. 2009) (discussing distinction among "basic" facts, "inferred"
facts, and "ultimate facts" and referring to ultimate facts as either mixed questions of law or fact or
conclusions of law).  For a discussion regarding the appropriate scope of appellate review of mixed fact-
law determinations, see U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge,
LLC, 138 S. Ct. 960  (2018).

An undersecured creditor that makes the § 1111(b)(2) election is entitled to have its entire claim treated in the plan as secured. The plan then must provide that the electing creditor will be paid the full amount of its claim . . . and that it will retain its original lien until the full amount of the claim is paid. By making the election, the creditor no longer has an unsecured claim and thus is not part of the unsecured class.

But does the plan have to pay the full amount of the electing secured creditor's claim with reasonable interest for a reasonable amount of time pursuant to § 1129(b)(2)(A)(i)(II)? If so, every undersecured creditor would make the election and § 506(a) would be meaningless. The answer is no. The claim is still bifurcated into secured and unsecured pursuant to § 506(a) for payment purposes. The *secured portion* of the claim is still paid in full with reasonable interest for a reasonable amount of time. However, the total payments made to the electing creditor in the plan must equal the full amount of the claim.

M. Jonathan Hayes & Roksana D. Moradi, The Section 1111(b) Election: A Primer, 31 Cal. Bankr. J. 755, 760 (2011) (emphasis in original) (footnote omitted) (citing In re Weinstein, 227 B.R. 284, 292 (B.A.P. 9th Cir. 1998)).

A simple application of the effect of the election is as follows. Assume a secured creditor holds a $100,000.00 claim, secured by collateral with a value of $30,000.00. Based on the value of the collateral securing the claim, only $30,000.00 is allowed as secured claim and $70,000.00 is allowed as an unsecured claim under 11 U.S.C. §506(a). If this undersecured creditor does not elect 1111(b) treatment and does not accept the debtor's chapter 11 plan, the plan would have to satisfy 11 U.S.C. §1129(b)(2)(A)(i)(II) with respect to the creditor's secured claim to be confirmed. That is, the creditor must receive deferred cash payments with a present value equal to the value of the creditors' interest in the estate's interest in such property – $30,000.00. The creditor's $70,000.00 unsecured claim presumably would be classified as an unsecured debt classified and paid on par with the unsecured creditors holding allowed claims.

If the creditor elected 1111(b) treatment, however, 11 U.S.C. §506(a) would not apply and

the creditor's entire allowed claim would be treated as secured.[24]  The creditor's election would not mean that, if the debtor intended to keep the collateral, a plan would have to pay interest on the entire amount of the creditor's claim.  The debtor's chapter 11 plan could be confirmed so long as (1) the creditor retained its lien against the property, (2) the creditor received cash payments totaling at least the amount of its allowed claim ($100,000.00), and (3) the creditor received cash payments on the secured portion of its claim equal to the present value of the creditor's interest in the estate's interest in the collateral ($30,000.00).  See 11 U.S.C. §1129(b)(2)(A)(i)(II).

In other words, once the creditor elects §1111(b) treatment, §1129(b)(2)(A)(i)(II) mandates that a plan pay the creditor the present value only on the amount that would have been allowed as the secured claim under §506(a) absent the election.  Section 1129(b)(2)(A)(i)(II) also mandates that a plan pay the creditor payments totaling the amount of the full allowed claim, though only at nominal value.

Assuming an appropriate present value interest rate of 6% in this hypothetical, the debtor could file a plan that satisfies §1129(b)(2)(A)(i)(II) by providing for 60 monthly payments of $580.00.  Those payments total $34,800.00, which includes $4,800.00 in interest.  If the creditor made a §1111(b) election, the plan would have to pay at least an additional $65,200.00 on account of the full $100,000.00 allowed secured claim.[25]

---

[24]     The tradeoff for this 1111(b) treatment is that the creditor would no longer possess a $70,000 unsecured claim, and therefore could not vote on the plan or receive a pro rata distribution as part of the unsecured class.

[25]     There is uncertainty whether the interest component of the $34,800.00 in payments also counts against the requirement that the debtor make payments totaling $100,000.00.  That is, it is unclear

(continued...)

Thus, in the case at bar, if First Bank's §1111(b) Election stands, the Debtor's plan would have to provide First Bank with a stream of payments equal to the present value of $80,000.00, while also paying First Bank a total of $970,233.13.  See n.1, supra.

### 2.  the purpose of the statutory right to make the §1111(b) election

Why does the Code provide secured creditors with this partial power to override the operation of 11 U.S.C. §506(a)?

One court explained it this way:

> The real benefit of the election is that it protects the creditor against a quick sale of its collateral. The amount of the creditor's secured claim may be determined at a time when the value of the collateral is temporarily depressed. Without the election, the debtor could sell the collateral when its value quickly rebounds and net a considerable gain. By making the election, the creditor guards against such an opportunistic sale because it retains a lien on the collateral equal to the full amount of its claim, albeit without interest.

Weinstein, 227 B.R. at 295 n.12; accord In re 183 Lorraine St. Assocs., 198 B.R. 16, 27 (E.D.N.Y. 1996) (noting that the purpose of the §1111(b)(2) election is to protect secured creditors from the opportunistic cashing out of their claims during periods of market contraction); 7 Collier ¶ 1111.03 ("section 1111(b) protects the legitimate expectation of secured lenders that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors").[26]

------

[25](...continued)
whether the debtor must provide for a distribution of an additional $70,000.00 to the creditor over the life of the plan or $70,000.00 minus $4,800.00.  See 7 Collier ¶ 1111.03[5][b].

[26]      Collier also explains how the issue got on Congress' "radar screen" as follows:

(continued...)

The election is not without its trade-offs:

> The electing secured creditor, in exchange for an unsecured deficiency claim which might otherwise control general unsecured creditor voting, gets the benefit of post-confirmation appreciation of its collateral. In effect, that creditor, by retaining its lien as security for its entire claim, holds that collateral hostage from the debtor's efforts to benefit from that post-confirmation appreciation of collateral until the entire amount of the creditor's claim is paid.

In re Scrubs Car Wash, Inc., 527 B.R. 453, 456 (Bankr. D. Colo. 2015).[27]

---

[26](...continued)

> Under the [former] Bankruptcy Act, . . . the debtor could . . . strip property of underwater nonrecourse mortgages, and retain the property through a judicial valuation at the nadir of value, reaping the entire amount of any subsequent appreciation in value. Prior to adoption of the Bankruptcy Code, there were many such Chapter XII cases, the opportunism in which caused concern and drew legislative attention.

Collier ¶ 1111.03[1][b].

[27]      The point made by the court in Scrubs Car Wash warrants an additional observation.

In a traditional chapter 11 case, an undersecured creditor that does not make the §1111(b) election may vote its unsecured claim and potentially hold a blocking position on confirmation.  See 11 U.S.C. §1129(a)(8).  However, the consent of the class of unsecured creditors is not required to confirm a plan under a chapter 11 case under subchapter V.  See 11 U.S.C. §1191(b).  Further, the "absolute priority rule" of 11 U.S.C. §1129(b)(2)(B)(ii) does not apply in subchapter V.  See 11 U.S.C. §1191(b), (c)(2); In re Moore Properties of Pers. Cty., LLC, 2020 WL 995544, at *5 (Bankr. M.D.N.C. Feb. 28, 2020).

The different confirmation standard under subchapter V enhances the ability of a subchapter V debtor to propose a confirmable plan that does not provide an attractive level of distribution to unsecured creditors.  Does that difference create a greater incentive for an undersecured creditor to make the §1111(b) election in a subchapter V case?  Perhaps so, but there may be other factors at play in the creditor's decision-making process.  Is the creditor truly concerned that the value of its collateral is only temporarily depressed?  To what degree,  percentage-wise and in absolute dollars, is its claim undersecured?  How conflict-free was the prepetition relationship between the creditor and the debtor's management?  Are there regulatory concerns creating an incentive for the creditor to account for its losses immediately and therefore, an incentive to use the §1111(b) election to block confirmation so that the creditor realize its collateral, rather than accepting a payment of its present value over time?

In the end, it appears likely that in subchapter V cases,  the §1111(b) election decision will remain a subjective, case-specific one for undersecured creditors.  See generally Jo Ann J. Bighton The Resurrection of Section 1111(b) in a Depressed Economy, 2010 Norton Ann. Surv. of Bankr. L. 12

(continued...)

### C. Inconsequential Value Under §1111(b)(1)(B)(i): The Legal Standard

11 U.S.C. §1111(b)(1)(B)(i) provides that if a creditor's "interest on account [of its claim] in [property of the estate] is of inconsequential value," the creditor may not make the §1111(b) election.

As stated in Part III.B, First Bank makes two (2) arguments which, if accepted, would mandate overruling the §1111(b) Election Objection.

Initially, based on Baxley, First Bank asserts that the term "inconsequential value" in §1111(b)(1)(B)(i) means "no value." Since there is some value to its secured position on the Debtor's property, First Bank argues that its interest in property of the estate is not of inconsequential value.

As I stated at the hearing in this matter, this argument is easily rejected on textual grounds. Section 1111(b)'s use of the adjective "inconsequential" to modify the noun "value" clearly implies that the interest contemplated does not have to be zero. If something is inconsequential, there necessarily can be some substance to that something, albeit quantitatively insignificant. See Merriam-Webster On-Line Dictionary, at https://www.merriam-webster.com/dictionary/inconsequential (last visited July 23, 2020) (defining inconsequential as "of no significance" and "unimportant," and including as synonyms the words "minor," "minute" and "slight"). It strains credulity to believe that Congress would use the term "inconsequential value" when it easily could have said "no value," if that is what it

---

[27](...continued)
(2020) (suggesting that the §1111(b) election is used either to block confirmation or as a "strategic exercise . . . to bring the parties to the table to negotiate a resolution that is driven by the cash flow of the reorganized debtor and which makes good business sense, rather than just meeting some statutory guidelines or standing on certain rights afforded under the Bankruptcy Code").

intended.  Accord Wandler, 77 B.R. at 733.

First Bank's second argument is that the court should compare the value of its lien to the

value of its collateral.  See Part III.B., supra.  Some courts adopt this approach, reasoning that the

most natural reading of the statutory text supports it.  See In re At-Net Servs.-Charlotte, 2015 WL

4915716, at *5; Rosage, 82 B.R. at 390.[28]  These courts appear to focus on the phrase "the

interest . . . in such [i.e., estate] property is of inconsequential value," treating it as a directive to

compare the value of the lien to the value of the collateral.[29]

Respectfully, I disagree.

As Collier points out, the phrase referenced by these courts simply "[re]states what section

506(a) already says: that an allowed secured claim is equal to the value of the collateral securing"

the claim.  7 Collier ¶ 1111.03[3][a].  The phrase explains how to value the interest and then

directs the court to determine whether that value is inconsequential.  The statutory text does not

state how to make that second determination of "inconsequentiality."  To make that

determination, you have to compare the value of the collateral to something else and the statutory

text offers no guidance there.

The correct methodology for determining whether the creditor's interest in the debtor's

---

[28]     As stated earlier, under this standard, a creditor holding a first position lien on the
debtor's property would always have an interest that is consequential and be entitled to make the §1111(b)
election, while only severely undersecured creditors would be precluded from making the election.

[29]     Collier mentions that there is a third method that has been used for measuring
inconsequential value: an abstract assessment.  7 Collier ¶ 1111.03[3][a].  Under this approach, a court
might, for example, find that a value of $1 million is not inconsequential, even if the total debt were $100
million, just because $1 million is a big number.  Perhaps there are cases where this third approach is
appropriate.  Based on the valuations involved in this case, even if this third approach has some merit, I
find it inapplicable.

property is inconsequential is by comparing the value of the creditor's lien position (i.e., the value

of its interest in the debtor's property) to the total amount of its claim.  I again agree with the

analysis in Collier:

> Section 1111(b) is intended to preserve creditors' nonbankruptcy rights, not
> enhance them. . . . Since "inconsequential" is not synonymous with "zero," plain
> meaning would suggest that "inconsequential value" has to include something
> more than zero value. This leads to the view that a creditor whose lien is almost,
> but not quite, out-of-the-money should be treated as if [it] were wholly unsecured,
> which is for practical purposes the status the creditor would likely ascribe to itself
> outside of bankruptcy with collateral of little or inconsequential value. Put another
> way, it [sic] if the collateral's value is inconsequential when compared to the total
> debt owed to the creditor, the creditor should be treated as unsecured, not secured
> [for purposes of §1111(b)(1)(B)].

Id. (footnotes omitted).


### D.  First Bank's Interest Is of Inconsequential Value

Finally, we have reached the heart of the matter: whether First Bank's interest in the

Debtor's property is of inconsequential value.  I conclude that it is.

If I were to employ a rigid, stare decisis approach to this decision, a strong case can be

made in support of First Bank's position that the §1111(b) Objection should be overruled.

In Wandler, the one reported case in which an objection to a §1111(b) election was

sustained on the basis of inconsequential value (other than cases involving wholly undersecured

creditors), the creditor's lien interest represented just 4% of the total claim.  The Debtor argues

that based on its roughly $30,000.00 valuation of First Bank's lien, which represents only 3% of

First Bank's total claim, its case is even stronger than that of the debtor who prevailed in

Wandler.  However, based on my factual finding, the value of First Bank's interest in the

Debtor's property is $80,000.00, which represents 8.2% of First Bank's total claim of

$970,233.13.  Of course, this is more than triple the percentage in Wandler, which necessarily reduces the precedential force of the decision.

The only reported case the parties' and my research found involving an equivalent relationship between the value of the creditor's interest in the debtor's property and the its total claim is Baxley, in which the value of the creditor's interest represented 8% of its total claim. Baxley held that the value was **not** inconsequential.  However, Baxley employed the "lien value to value of collateral methodology," which I have rejected.  There is no way to know how the Baxley court would have ruled had it followed the approach that I have adopted.

Further, I point out that in the context of making a mixed-fact law determination as to how much value is "inconsequential" under §1111(b)(1)(B)(i), prior reported decisions inherently have limited precedential value.  See In re Crater, 286 B.R. 756, 772 (Bankr. D. Ariz. 2002).[30]

The key point here is that the "inconsequential value" determination is not a bean counting exercise; the determination cannot be based solely on a mechanical, numerical calculation.  Some consideration must be given to the policies underlying both the right to make the §1111(b) election and the exception to that statutory right.  In other words, while "the

---

[30]     In Crater, the court explained:

> There are many areas of bankruptcy law where Congress apparently intended bankruptcy judges to weigh the evidence and utilize their experience and judgment to decide individual cases on a case by case basis. It does so by using terms that are inherently incapable of fine definition, such as "good faith," "substantial abuse," "undue hardship," and the like. . . .  Perhaps such areas of bankruptcy law are best dealt with as in the civil system, with each judge reading and applying the statute and its underlying policies and principles to each factual situation that comes up, without regard to what the last judge did on different facts. Reported decisions in such areas serve little useful purpose, and in fact may be counterproductive.

286 B.R. at 772.

numbers" provide an important starting point in deciding how much value is "inconsequential," the court also must consider other relevant circumstances presented in the case and make a holistic determination that takes into account the purpose and policy of the statutory provisions that govern the reorganization case. Analyzing this case in that fashion, I find that First Bank's $80,000.00 interest in the Debtor's property is inconsequential under 11 U.S.C. §1111(b)(1)(B)(i).

At bottom, this case does not resemble the classic fact pattern that Congress designed §1111(b) to prevent. First Bank is not a secured creditor being cashed out during a temporary decline in the value of its collateral, with the Debtor seeking to retain such collateral and obtain the windfall benefit of a market correction in the foreseeable appreciation that restores value to the collateral. If anything, the evidence indicates that the value of First Bank's collateral – the Debtor entity as currently structured – may be permanently contracted. While some benefit in purchasing a fitness entity like the Debtor as a going concern would be derived from the ongoing nature of its operations and a paying base of customers, I credit Jackim's testimony and report regarding the fundamental changes that fitness centers will likely need to implement to be profitable in the post-COVID-19 world. These changes, such as new social distancing and sterilization rules, smaller in-person class sizes, and greater provision of remote workouts, could represent a fundamental shift in the bundle of fitness services that the Debtor had offered to its former customer base. And, it is not at all clear to me that the same base of consumers that paid for the Debtor's pre-COVID-19 fitness services would continue to do so after such changes are implemented. Thus, the depressed enterprise value of the Debtor and the need for significant retooling and effort to rebuild the business from the ground up, separates this case from cases

involving collateral (such as real estate) that decline and then rise again purely for market forces.

Summing the situation up, the Debtor's financial difficulties prior to the commencement of this bankruptcy case in January 2020, as well as the effect of the COVID-19 pandemic that struck in March 2020, have caused a precipitous decline in the value of the Debtor's business and First Bank's lien position.  It is clear that the entire fitness industry faces an uncertain future, and there is no quick rebound in sight that would provide the Debtor with a windfall.  The best evidence indicates that if the Debtor's business can survive at all, its value will not increase rapidly in the foreseeable future; at best, any increase will occur through gradual growth.  In the uncertain event that this growth even occurs, it probably will be attributable to some combination of market forces, the entrepreneurial efforts and acumen of the Debtor's principal and, perhaps, the investment of additional capital.  These circumstances support a more elastic application of the term "inconsequential value" in §1111(b)(1)B)(i).

To some degree also, the Debtor's election to reorganize under subchapter V and the purposes and policies underlying the SBRA influence my determination of the level of value that is "inconsequential."

The purpose of the SBRA is "to broaden the opportunity for small businesses to successfully utilize the benefits of chapter 11 of the Bankruptcy Code."  In re Ventura, 615 B.R. 1, 6 (Bankr. E.D.N.Y. 2020).  In light of current economic conditions, the future prospects in the fitness industry and the Debtor's status as a small business debtor under subchapter V, permitting the Debtor to stay in business by bifurcating the severely undersecured First Bank claim, providing for its allowed secured claim, as  determined by operation of 11 U.S.C. §506(a), and paying its unsecured creditors only the amount that its projected disposable income for three (3)

to five (5) years permits is consistent with both the explicit confirmation standards of subchapter V, <u>see</u> 11 U.S.C. §1191 (b), (c), and the underlying purpose of the SBRA.[31]

Further, to the extent the First Bank is using the §1111(b) Election as a device to block confirmation and compel the Debtor to liquidate,[32] that only underscores the inconsequential value of its interest in the Debtor's property.  If the Debtor does not reorganize, its property will be liquidated and the liquidation value of the property (here, approximately $30,000.00) will be the actual value First Bank will realize.  Surely, a receipt of $30,000.00 on a $917,000.00 debt is "almost, but not quite, out of the money."  7 <u>Collier</u> ¶ 1111.03[3][a].  Admittedly, when valuing the Debtor's property as a going concern, as I have done here, determining the value of the assets to be $80,000.00 or 8.2% of the outstanding debt, the issue is a closer call.  Nevertheless, for the reasons expressed, I find that value is sufficiently marginal to preclude First Bank from making the §1111(b) election.

---

[31]  In considering purposes and policy of the SBRA, I do not mean to suggest that the term "inconsequential value" has a different meaning in a subchapter V case as compared to a traditional chapter 11 case.  Famously, in <u>Dewsnup v. Timm</u>, 112 S. Ct. 773, 778 (1992) the Supreme Court implied that the term "allowed secured claim" in 11 U.S.C. §506(d) might have a different meaning in different chapters of the Bankruptcy Code, a passage that has received much criticism.  <u>See</u> <u>Bank of Am., N.A. v. Caulkett</u>, 135 S. Ct. 1995, 2000 n.†(2015).  But <u>Dewsnup</u> involved an issue of statutory construction, a pure issue of law.  By comparison, here the bankruptcy court is undertaking the task of "factfinding" in determining, on a particular set of facts, after making a valuation determination, whether a creditor's lien interest is of inconsequential value.  As I stated earlier, this is a mixed-fact law determination, <u>i.e.</u>, the determination of an "ultimate fact."  In making that determination, it is appropriate for the court to consider statutory policy as a factor in applying the statutory term to a particular set of facts.

[32]  No criticism of First Bank is intended in my consideration of this possibility.  First Bank has the right to pursue its own best interests.

## VI.  CONCLUSION

For the reasons stated above, in this subchapter V case, I hold, based on the particular

facts and circumstances presented, that the $80,000.00 value of First Bank's interest in the

Debtor's property, representing 8.2% of its total claim is "inconsequential" within the meaning of

11 U.S.C. §1111(b)(1)(B)(i).  Therefore, the Debtor's §1111(b) Election Objection will be

sustained, the Debtor's Valuation Motion will be granted and an order will be entered

determining that First Bank holds an allowed secured claim of $80,000.00 and a general

unsecured claim of $890,233.13.

## VII.  EPILOGUE

The Debtor has succeeded in preventing First Bank from making the §1111(b) Election

and in bifurcating First Bank's allowed claim into secured and unsecured components pursuant to

11 U.S.C. §506(a).

The Debtor's success in these contested matters is largely the product of my crediting the

testimony of a key Debtor witness (Jackim).  That testimony also suggests that this case has

serious feasibility issues at confirmation.  The likely operating losses in the immediate future, the

need for capital to cover those losses and for recruitment of new fitness club members, and

continuing public health uncertainties all raise questions whether the Debtor can reorganize in the

absence of some cash infusion.

Further, in its chapter 11 plan, the Debtor will be obliged to provide for payment of the

present value of First Bank's $80,000.00 allowed secured claim.  The longer that market

conditions compel the Debtor to defer payment of the allowed secured claim, the greater the risk

imposed on First Bank.  At some point, the risk may become so great as to preclude a finding that the plan is fair and equitable to the creditor.  See, e.g., In re Prussia Assocs., 322 B.R. 572, 595 (Bankr. E.D. Pa. 2005) (a plan is not fair and equitable if it substantially shifts the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose); see also In re TCI 2 Holdings, LLC, 428 B.R. 117, 168 (Bankr. D.N.J. 2010) (to be confirmed, a plan must not unduly shift the risk of reorganization to a dissenting class).

The point here  – and it is one that the Debtor has acknowledged – is that defeating a §1111(b) election on the ground that the creditor's interest in the debtor's property is of inconsequential value may render confirmation of a chapter 11 plan very difficult.  Perhaps there is a "Goldilocks zone," a narrow path that a debtor can navigate between the inconsequential value left in the business and feasibility of a proposed Chapter 11 plan; perhaps not.

The Debtor has won this battle, but it remains to be seen whether the Debtor will win the war.


**Date:  August 7, 2020**                  _____
                                           **ERIC L. FRANK**
                                           **U.S. BANKRUPTCY JUDGE**